IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SANTIAGO SOTO,

      Plaintiff,                        No. CIV S- 04-0571 FCD GGH P

    vs.

WARDEN D. L. RUNNELS,

      Defendant.                  FINDINGS AND RECOMMENDATIONS

_____/

Introduction

        Plaintiff, a state prisoner proceeding pro se, seeks relief pursuant to 42 U.S.C. § 1983. Pending before the court is defendant's motion for summary judgment, filed on October 17, 2005, to which plaintiff filed an opposition on November 2, 2005.

Complaint

        As set forth in a prior filing by the court,[1] plaintiff, who sues only for prospective injunctive relief, alleges that the implementation of "Op. 1" on April 29, 2002, by the defendant

\\\\\

---

[1] See Order and Findings and Recommendations, filed on January 5, 2006 at pp. 1-2. (The Findings and Recommendations were adopted by Order, filed on March 2, 2006).

1

warden[2] resulted in two unconstitutional policies in violation of the Eighth and First Amendments: one, compelling High Desert State Prison (HDSP) inmates, including plaintiff, to choose between outdoor exercise and law library access; the other, limiting prisoners' weekly outdoor exercise to from zero to three hours per week.  Form Complaint, p. 8;Attachment, pp. 3-6.

Plaintiff seeks relief in the form of a declaratory judgment that defendant's policies violate plaintiff's Eighth Amendment rights and in the form of an order requiring defendant to implement a policy that allows at least 10 hours a week of outdoor exercise and a policy that provides for law library exercise at times/days not allotted for outdoor exercise.  Form Comp., p. 8, Attachment, pp. 5-6.

Motion for Summary Judgment

*Legal Standard for Summary Judgment*

Summary judgment is appropriate when it is demonstrated that the standard set forth in Fed. R. Civ. P. 56(c) is met.  "The judgment sought shall be rendered forthwith if . . . there is no genuine issue as to any material fact, and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct., 2548, 2553 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

---

[2] Although plaintiff initially named T. Felker as the defendant, ascribing the prison policies at issue to him, as he sues only for prospective injunctive relief, the court substituted in the name of the current Warden of High Desert State Prison.  See Order filed on July 14, 2004, fn. 1.

to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322, 106 S. Ct. at 2552. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323, 106 S. Ct. at 2553.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11, 106 S. Ct. at 1356 n. 11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

1 genuine need for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255, 106 S. Ct. at 2513.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S.Ct. 1356 (citation omitted).

On August 26, 2004, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999), and Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

*Discussion*

Defendant moves for summary judgment as a matter of law, contending that Operational Procedure No. 1 at High Desert State Prison (HDSP) (which plaintiff identifies as "Op. 1," and which the court will hereafter abbreviate as "OP No. 1") does not, as plaintiff alleges, compel plaintiff to choose between outdoor exercise or accessing the law library.  Motion for Summary Judgment (MSJ), pp. 3-4.  Moreover, defendant argues that plaintiff has suffered no injury as a result of failing to obtain law library access and therefore fails to allege a

4

1  violation of the First Amendment. Id., at 4. With respect to plaintiff's claim that Op. No. 1
2  limits his access to the yard to between zero to three hours per week in violation of his Eighth
3  Amendment rights and his demand for ten hours a week of outdoor exercise, defendant argues
4  that no evidence supports his claim that he is being so limited; that there is no constitutional
5  requirement that he receive ten hours weekly of outdoor exercise and that Op. No. 1 is reasonably
6  related to a legitimate penological interest. MSJ, pp. 7-11.

7  It is important at the outset of this discussion to reiterate that the complaint
8  challenges only the policies listed above. Plaintiff does *not* allege in the complaint that the
9  policies *as applied* do not in practice give inmates even the levels of exercise set forth in the
10  policies, and therefore establish further violations of the Constitution, although he appears to take
11  that tack in several places in the opposition to summary judgment. The purpose of the complaint,
12  of which plaintiff is master, is to apprise defendants of the claims which will be made and for
13  which an answer and defense prepared. Plaintiff may not, by way of opposition to summary
14  judgment, expand his claims into areas not fairly encompassed by the complaint. A de jure
15  attack on stated policies is one thing, and an overall attack of de facto events is quite another –
16  the latter being very fact intensive. Moreover, plaintiff must exhaust administrative remedies and
17  there is no suggestion that the de facto attack was ever submitted to prison officials. Therefore,
18  this Findings and Recommendation will confine itself to the issues stated in the complaint.

19  Defendant sets forth Undisputed Material Facts (DUDF), the following of which
20  are, in fact, not disputed by plaintiff:

> 1. At all times relevant to this action, Plaintiff Santiago Soto was
> an inmate in the custody of the California Department of
> Corrections and Rehabilitation (CDCR), housed at the
> High Desert State Prison (HDSP) in Susanville, California.
> Defendant's Exhibit (DX) A, pp. 1-5.[3] Soto has been an inmate in
> the custody of the CDCR since May 17, 1996. Soto has been an
> inmate at HDSP since April 17, 2000. Since his arrival at HDSP,

---

[3] Defendant's Exh. A includes the abstract of judgment for plaintiff's commitment as well as his subsequent chronological history within the CDC (now CDCR).

5

1. Soto has been housed on the following yards: D Facility from April 17, 2000 to March 23, 2001; C Facility from March 23, 2001 to April 10, 2002; D Facility from April 10, 2002 to May 26, 2002; C Facility from May 26, 2002 to May 19, 2004. On May 19, 2004, Soto was moved back to D Facility where he currently remains. Soto was briefly housed in administrative segregation from April 10, 2002 through May 26, 2002, and again from May 19, 2004 through June 17, 2004. With the exception of these two times, Soto has been in the general population during the relevant time period. Decl. of D. Runnels, ¶¶ 5-6.

2. At all times relevant to this action, Defendant Runnels was the Warden at HDSP. Declaration of D. Runnels In Support of Motion for Summary Judgment, ¶1.

3. Operational Procedure (OP) No. 1, was implemented on April 29, 2002. The OP No. 1 deals with inmate count, movement, feeding and work release. The OP No. 1 sets a schedule for inmate movement for the various facilities. The HDSP OP No. 1 is now the HDSP Departmental Operations Manual (DOM) Supplement 52020. Decl. of D. Runnels, ¶¶ 4, 8.

4. There are five facilities (also referred to as "yards") at HDSP. These are facilitiesA, B, C, and D and E. Facilities A and B are a 270 design facilities. Facilities C and D are a 180 design facilities. Facility E is a level one minimum support facility. Decl. of D. Runnels, ¶ 8.

5. The manner in which inmates are released for various activities throughout the day such as meals, showers, job assignments, classification committees, and outdoor recreation depends on various factors. These factors include the inmates' work group and privilege group, institutional count, as well as the needs of the facilities. Furthermore, there is a fixed number of daylight hours during which certain programs, such as yard, can be safely run. Decl. of D. Runnels, ¶ 9.

6. Every able bodied person committed to the custody of the Director or Corrections is obligated to work as assigned by department staff and by personnel of other agencies to whom the inmate's custody and supervision may be delegated. Assignment may be to a full day of work, education, or other program activity, or to a combination of work and education or other program activity. Cal. Code Regs. tit. 15, § 3040(a). In accordance with this provision of the title 15, inmates are classified and assigned to one of the various work and privilege groups. The various work group/privilege groups are: A2/B, A1/A unassigned, and A1/A on RDO, A1/A assigned. Decl. of D. Runnels, ¶ 10.

\\\\\

**Access to Outdoor Exercise**

7. Inmates classified as A2/B, A1/A unassigned, and A1/A on RDO receive the following number of hours of "outdoor exercise," (hours released to the yard for recreation) Monday through Friday on a rotating week:
Week One - 4.5 to 5 hours per week;
Week Two - 6.75 to 7.25 hours per week;
The inmates in the above classifications receive no hours on Saturdays, Sundays and Holidays. Decl. of D. Runnels, ¶ 11.

8. Inmates classified as A1/A assigned, receive the same time as the group above, depending on their work schedule. On Saturdays, Sundays, and Holidays, A1/A assigned inmates receive 2.25 hours per day, except for the A1/A inmates assigned to the in-cell education bridging program who receive 4.5 hours per weekend day and Holiday because they do not normally receive yard during the week because of their work hours which are 0730 to 1530 hours, Monday through Friday. Decl. of D. Runnels, ¶ 11.

10. Facilities C and D, which is where Soto has been housed while at HDSP, are 180 design facilities which house level IV inmates (maximum security inmates). These facilities are each divided into 8 buildings, 1 through 8. Each building is further divided into three sections, A, B, and C. Each section is separated by a concrete wall. Buildings 1 through 4 are referred to as the "lower yard." Buildings 5 through 8 are the "upper yard." There are approximately 128 inmates in each building. The lower yard shares one recreational yard and the upper yard shares a separate recreational yard. Decl. of D. Runnels, ¶¶ 12-13.

12. In addition, many inmates have jobs or academic or vocational programs that they are released to in the mornings. Others are released to the sick call line, the pill line, or the insulin line. Accordingly, there would be a great deal of traffic in and out of the housing units if all these things were done at once. Decl. of D. Runnels, ¶15.

13. To alleviate the traffic and maintain order, inmates are released to their various programs and activities at different times depending on a set schedule. Decl. of D. Runnels, ¶ 16.

14. Pursuant to the schedules set in the OP No. 1, two hours and fifteen minutes are scheduled for outdoor yard time in the mornings and two hours and fifteen minutes are scheduled for outdoor yard time in the afternoons. Since the lower yard consists of four buildings, each divided into three sections, and the upper yard consists of four buildings, each divided into three sections as well, it is not possible to release all buildings to the yard at the same time. Accordingly, inmates do not get five hours of outdoor yard time per day. Rather, buildings rotate pursuant to

the Facility Yard Schedule. Decl. of D. Runnels, ¶ 17.

18. On alternating weeks, Soto receives on average three days of outdoor exercise one week and two days the following week. Exhibit B, Plaintiff's Deposition, 20:5-9. Soto has suffered no physical injury as a result of inadequate exercise. Exhibit B, Plaintiff's Deposition, 22:18-22.

19. Inmates are not necessarily confined to their cells when not on the yard for outdoor recreation. Inmates are released from their cells for work, education, classification committees, medical, and various other activities. They also have access to the day room on their non-yard days. Decl of D. Runnels, ¶ 19.

**Access to the Law Library**

20. The DOM Supplement 53060 addresses law library access. In accordance with the DOM supplement, the facility libraries operate according to the posted schedules. Schedules are set taking into consideration all programs such as work and education, meals, committees, showers, and recreation, and they take staffing issues into consideration as well. Institutional circumstances may alter library access per safety and security needs. Decl. of D. Runnels, ¶ 20.

21. Facilities C and D each have their own law library and hours of operation. Decl. of D. Runnels, ¶ 22.

22. The C Facility Law Library has the following hours of operation: Tuesday - 7:30 a.m. to 9:30 a.m.; 9:45a.m. to 11:45 a.m.; and 1:00 p.m. to 2:45 p.m. Wednesday - 7:30 a.m. to 9:30 a.m.; 9:45a.m. to 11:45 a.m.; and 1:00 p.m. to 2:45 p.m. Thursday - 7:30 a.m. to 9:30 a.m.; 9:45a.m. to 11:45 a.m.; and 1:00 p.m. to 2:45 p.m. Friday - 7:30 a.m. to 9:30 a.m.; 9:45a.m. to 11:45 a.m.; and 1:00 p.m. to 2:45 p.m. Saturday - 8:00 a.m. to 10:00 a.m; 10:15 a.m. to 11:45 a.m.; and 1:00 p.m. to 2:45 p.m. Decl. of D. Runnels, ¶ 22.

23. The D Facility Law Library has the following hours of operation: Tuesday - 8:30 a.m. to 10:30 a.m.; and 12:30 p.m. to 2:30 p.m. Wednesday - 8:30 a.m. to 10:30 a.m.; and 12:30 p.m. to 2:30 p.m. Thursday - 8:30 a.m. to 10:30 a.m.; and 12:30 p.m. to 2:30 p.m. Friday - 8:30 a.m. to 10:30 a.m.; and 12:30 p.m. to 2:30 p.m. Saturday - 8:30 a.m to 10:30 a.m.; and 1:00 p.m. to 3:00 p.m. Decl. of D. Runnels, ¶ 22.

24. In order to access the law library, an inmate must complete a law Library Access Request form and submit it to the law library by giving it to his Building Floor Officer who will take all completed law library access request forms to the Program Office or give them directly to the Library Technical Assistant (LTA). The

      LTA picks up all completed Law Library Access Request Forms from the Program Office on a daily basis. The LTA then submits a list based on these requests to the Inmate Assignment Office (IAO) for ducating. All inmates requesting access will receive a ducat noting the date and time to report to the Law Library. Decl. of D. Runnels, ¶ 23.

      25. Inmates may access the law library based on the following priorities. Inmates with verifiable court case deadlines, Priority Legal Users, have first priority in order of imminence. Inmates doing legal research, or General Legal Users, have second priority. Last are inmates requesting recreational reading. Decl. of D. Runnels, ¶ 24.

      26. The Law Library cannot accommodate all inmates at once. There is a limit of 12 inmate users and three clerks in the Law Library at any time. This is due to the size and capacity of the Law Library and the number of staff assigned to the Law Library. This serves to preserve the safety and security of the institution, inmates, and staff. Too many inmates in the Law Library at one time can cause disruptions which are more difficult to control than if a smaller number of inmates are allowed. Decl. of D. Runnels, ¶ 25.

      27. It may happen at times that an inmate is "ducated' to go to the law library during the time that he is scheduled to go to the yard. In that event, the inmate must make a choice. However, OP #1, DOM Supplement 52020, does specifically [sic] schedule yard time so as to force the inmates to have to choose between one of the two activities at all times.[4] Decl. of D. Runnels, ¶ 26.

      28. Soto has never missed a court deadline because of a lack of access to the law library. Exhibit B, Plaintiff's Deposition, 20:23-25.

Defendant's Separate Statement of Undisputed Facts.... (DUDF), pp. 2 - 7.

      Plaintiff's premise about a Hobson's choice commences with an implicit misimpression – that he is entitled on a continuing basis to utilize the maximum number of law

---

[4] Although defendant sets forth as an undisputed fact that OP No. 1 specifically forces inmates to have to choose between yard or the law library "at all times," in both the defendant's declaration and the separate statement, it is clear by the memorandum of points and authorities, that defendant meant to state, within DUDF No. 27, that the policy does **not** compel inmates to have to choose one or the other activities all the time. Defendant also, at another point, apparently inadvertently, states: "There are no facts which could not lead a rational trier of fact to find for Plaintiff." MSJ at p. 5.

library hours permitted by the policies, and therefore, if he does so, such law library use sets up an inherent conflict with utilization of policy granted exercise time. Plaintiff is not constitutionally entitled in the abstract to use a maximum amount of law library time. Moreover, even if, *at times*, plaintiff's use of the law library may be intensive enough to foreclose allotted exercise time, plaintiff faces no more a difficult *temporary* choice than do people everywhere, i.e., a person's duties or obligations sometimes preclude utilization of otherwise desired recreation time. This is life, not an Eighth Amendment violation.

Nor is the undersigned's conclusion ultimately contrary to plaintiff's cited case of Allen v. City and County of Honolulu, 39 F.3d 936 (9th Cir. 1994), a case which held that a prisoner did not have to sacrifice a right of access to the courts in order to get exercise, or vice versa. The Allen case was decided prior to the seminal case on access to the courts – Lewis v. Casey, 518 U.S. 343, 116 S. Ct. 2174 (1994). Allen viewed the access to the courts issue as one of fundamental proportion, and nearly unlimited with respect to provision of law library time, citing Bounds v. Smith, 430 U.S. 817, 97 S. Ct. 1491 (1977). However, Lewis greatly retracted the prisoner's access to the courts insofar as a violation of such access could only be shown if plaintiff suffers an *actual* injury from lack of law library access. It is no longer sufficient to posit a hypothetical conflict between maximum possible, continuous utilization of the law library for whatever purpose and potential exercise time. Plaintiff herein has posited no such actual injury. That is, he has not raised an issue of fact that the policies at issue here caused him to sacrifice exercise time over a lengthy period in order to avoid an actual, imminent legal injury. Indeed, after Lewis, such a showing would be very difficult. See also Cornett v. Donovan, 51 F.3d 894, 898 (9th Cir. 1995) (right of access to a law library extends only to the pleading stages of a lawsuit). Generally, the pleading stages of a lawsuit do not extend over a period of time such that continuous and long term access to the law library is required. Thus, plaintiff has not demonstrated any actionable conflict between law library usage and exercise time post-Lewis.

\\\\\

1    In his deposition, as defendant notes, plaintiff conceded that he has not been
2  precluded from meeting a court deadline, or suffered any actual injury in relation to the court
3  access he has had, by implementation of OP No. 1. Defendant's Undisputed Material Fact
4  (DUDF) No. 28, Exhibit (Exh.) B, Plaintiff's Deposition (P Depo), 20:23-25.[5]  Moreover, in his
5  opposition, he expressly states that "plaintiff has never alleged that OP No. 1 interferes with his
6  right of access to the courts." Opp., p. 7. Plaintiff also concedes that every inmate with a court
7  deadline is accorded priority over general legal users, with recreational law library users coming
8  last, and he does not challenge that policy. Opp., p. 5. He even calls the existing law library
9  policy "a perfect way to classify library users...." Id.
10   As plaintiff alleges no actual injury in connection with the policy at issue,
11 defendant is entitled to judgment as a matter of law on any claim by plaintiff that his rights under
12 the First Amendment to access the courts have been violated under defendant's OP No. 1 policy.
13 Plaintiff frames his claim as one wherein he is compelled by the policy to choose between one
14 constitutionally guaranteed right (under the Eighth Amendment) (right to adequate outdoor
15 exercise) in order to exercise another (under the First Amendment) (right of access to the courts),
16 and that OP No. 1 does not infringe on his right of court access only because he forgoes outdoor
17 exercise for law library exercise. Opp., pp. 7 - 8.
18 \\\\\

---

[5] It is odd, even somewhat jarring, that plaintiff refers to himself in the third person, at least throughout the deposition excerpt defendant has submitted; for example, in the excerpt that includes testimony used as support for DUDF No. 28, the exchange reads: "Q. 'Have you ever missed a court deadline because of a lack of access to the law library?' A. 'He hasn't lost a deadline. These last 12 days he's been trying to get into the library to make copies of a habeas corpus petition that he would like to submit, but he says he hasn't been able to access the library.' Q. 'Do you expect to be able to access the library eventually to file this habeas corpus petition?' A. 'Yes. Eventually, yes.' Q. 'Other than the habeas corpus petition, is there any other legal action you have not been able to take because of the limited law library access?' A. 'No.'" Exh. B., 20: 23-25 through 21:1-11. As defendant's counsel has put "Gracias" on the record more than once in the deposition, the most logical explanation is that plaintiff testified in Spanish and an interpreter translated for plaintiff, feeling it necessary to modify the more extended responses from the first person to the third person voice, apparently to reflect that the testimony in English was a translation.

1  However the claim is characterized, because plaintiff concedes that he has not
2 suffered any First Amendment injury, on account of the policy, and importantly has set forth no
3 facts which demonstrate that he avoided an "actual legal injury" by sacrificing exercise time over
4 a lengthy period on account of the policies at issue, this matter proceeds only on his claim of a
5 violation of the Eighth Amendment, on the more narrowed basis that the policy deprives, or
6 potentially deprives, him only of adequate outdoor exercise.  Plaintiff attempts to place in dispute
7 the following facts that defendant has set forth as undisputed:

> 9. The reasons for the set schedules and the limits on the numbers of hours inmates can have access to the yard are not only legitimate, but compelling in order to preserve the safety and security of the prison at all times. Decl. of D. Runnels, ¶ 12.
>
> 11. It is not possible, nor is it prudent to release all inmates in the lower yard or the upper yard at the same time. That would place over 500 inmates on each yard at once. For obvious security reasons, that cannot be done. It is extremely difficult to supervise a group which consists of 500 inmates as opposed to a group which consists of 128 or less. For example, if a fight or riot was [sic] to break out on the recreational yard, it would easier to control 128 inmates and to restore order. Decl of D. Runnels, ¶ 14.
>
> 15.  On Monday through Friday, Facilities C and D yards run from 9:15 to 11:30 in the morning and again from 1:00 to 3:15 in the afternoon. See, Attachment A to Decl. of D. Runnels, Schedule of Facility C Inmate Movement Monday through Friday and Schedule of Facility D Inmate Movement Monday through Friday.
>
> 16. On Saturday, Sundays, and Holidays, Facilities C and D yards run from 8:15 to 11:30 in the morning and again from 12:30 to 3:30 in the afternoon. See, Attachment A to Decl.of D. Runnels, Schedule of Facility C Inmate Movement Saturday, Sunday, and Holidays and Schedule of Facility D Inmate Movement Saturday, Sunday, and Holidays.
>
> 17. Nonetheless, over a two-week time period, inmates average between 11.25 and12.25 hours of outdoor yard time. Decl. of D. Runnels, ¶ 18.

24  Plaintiff avers that upon his arrival at HDSP in April, 2000, and for about two
25 years thereafter, he and the rest of the general population inmates received from 10 to 12 hours of
26 outdoor exercise per week, with yard access beginning at 9:00 a.m. and ending at 1:15 p.m.

1  (plaintiff does not specify the days of the week for this schedule).  Opp., p. 2.  As of April 2002,
2  when the new policy was implemented, the hours were reduced to 4 hours and thirty minutes for
3  one week, followed by 6 hours and 45 minutes the following week.  Opp., p. 2, see also, DUDF
4  No. 7.
5             Plaintiff argues that inmates are scheduled to access the law library on their
6  outdoor exercise days; forcing them to give up outdoor exercise time in order to go to the library
7  (or the reverse).  Plaintiff filed grievances about what he calls the two policies, which were
8  rejected as untimely.  (Unnumbered) Exhibits to Opp., p.2.  Plaintiff also contends that it is
9  prison staff practice to cancel outdoor exercise for a variety of reasons, including staff shortages,
10 staff training days, officers' funerals and incidents occurring at other facilities.  Opp., p. 2.  He
11 alleges that, for example, on October 24, 2005, outdoor exercise (elsewhere he gives this date as
12 one on which dayroom was cancelled) was cancelled due to an incident at another facility.
13 Plaintiff takes specific issue with the amount of outdoor exercise currently provided to D-yard
14 general population inmates, the yard on which he is housed.  Opp., p. 3.  Plaintiff includes a
15 number of declarations, in addition to his own, that contradict defendant's representation as to
16 the amount of outdoor exercise these inmates are allowed.  Id.
17             Plaintiff alleges that during normal programming, "'open-line'" access to the law
18 library is called from Tuesday to Saturday while inmates are exercising on the yard, that inmates
19 are still ducated for the law library on their outdoor exercise days; that defendant admits that
20 inevitably an inmate will have to choose between the yard and the law library but that this choice
21 is not occasional but constant.  Opp., pp. 5-6.  Plaintiff goes to on to contend that defendant's
22 statement that because plaintiff goes to the yard for two to three days a week on a rotating
23 schedule, "[t]hat leaves two to three days during the week during which plaintiff does not have
24 yard time and during which he may go to the law library" is precisely the relief he is seeking, to
25 his March 22, 2004 complaint (see p. 6 of attachment to complaint).  Opp., pp. 6-7, citing MSJ at
26 p. 5.  Plaintiff contends that defendant could allow inmates to be ducated for library access on

their non-yard days. Opp., p. 8. He insists that outdoor exercise is already limited to zero to three hours per week, even though he has earlier stated that the schedule is 4 hours and thirty minutes for one week, followed by 6 hours and 45 minutes the following week on a rotating schedule basis. This inconsistency is not explained by the apparent conflict in law library access because he is saying that even with the law library accommodation he seeks, he would be reduced to zero to three hours a week. Plaintiff "demands" ten hours a week of outdoor exercise, stating that the California Code of Regulations establishes that he has a liberty interest in no less than ten such hours and that OP No. 1 is not reasonably related to a legitimate penological interest. Opp., p. 8.

The remainder of plaintiff's opposition continues in this vein. Although plaintiff does an impressive job for a pro se incarcerated plaintiff in marshaling various and sundry facts about de facto lack of exercise, he forgets that his complaint is singularly focused on the exercise *policy(s)*, not the implementation of that policy. Plaintiff makes little effort to demonstrate that the exercise policy itself falls below Constitutional minima.

The Ninth Circuit has recognized that exercise is "one of the basic human necessities protected by the Eighth Amendment." LeMaire v. Maass, 12 F.3d 1444, 1457 (9th Cir. 1993).

> An Eighth Amendment claim that a prison official has deprived inmates of humane conditions must meet two requirements, one objective, and one subjective. Farmer v. Brennan, 511 U.S. 825, [834,] 114 S. Ct. 1970, 1977 [] (1994). Under the objective requirement, the prison official's acts or omissions must deprive an inmate of "'the minimal civilized measure of life's necessities.'" Id.(quoting Rhodes v. Chapman, 452 U.S. 337, 347, 101 S. Ct. 2392, 2399-2400 [] (1981). The subjective requirement, relating to the defendant's state of mind, requires deliberate indifference. Farmer, 511 U.S. at [837,] 114 S. Ct. at 1979.

Allen v. Sakai, 48 F.3d 1082, 1087 ( 9th Cir. 1994).

In Allen v. Sakai, 48 F. 3d at 1088, the court found that a long-term deprivation of exercise did constitute a denial of a basic human need in violation of the Eighth Amendment

(prisoner in secured housing allowed only forty-five minutes of outdoor exercise per week for six weeks violated Eighth Amendment); see also, Lopez v. Smith, 203 F.3d 1122, 1133 & n. 15 (prisoner deprived of outdoor exercise for 45 days constituted cruel and unusual punishment).

Earlier, the Ninth Circuit had held that a deprivation of outdoor exercise for a "period of years" contravenes the Eighth Amendment; however, the court did not consider whether deprivation of outdoor exercise was a per se violation of the Eighth Amendment. Spain v. Procunier, 600 F.2d 189, 199-200 (9th Cir. 1979). By contrast, an inmate's allegation that he was not allowed, inter alia, outdoor exercise for 21 days while in the Disciplinary Segregation Unit did not demonstrate a serious deprivation and deliberate indifference. May v. Baldwin, 109 F.3d 557, 565 (9th Cir. 1997); see also, Hoptowit v. Ray, 682 F.2d 1237, 1258-59 (9th Cir. 1982) (denial of opportunity for regular outdoor exercise violates the Eighth Amendment, but can be temporarily denied under prison conditions that warrant it); Hayward v. Procunier, 629 F.2d 599, 603 (9th Cir.1980) (deprivation of outdoor exercise and five-month lockdown in response to genuine emergency – i.e., safety or staffing concerns – did not violate the Eighth Amendment). On the other hand, it has been found that deprivation of outdoor exercise for a six-month period violates the Eighth Amendment: "[d]eprivation of outdoor exercise violated the Eighth Amendment rights of inmates confined to continuous and long-term segregation." Keenan v. Hall, 83 F.3d 1083, 1089-1090 (9th Cir. 1996), citing Spain v. Procunier, 600 F.2d at 199 ("There is substantial agreement among the cases in this area that some form of regular outdoor exercise is extremely important to the psychological and physical well being of the inmates.").

At note 15, Lopez, 203 F.3d at 1133, noted the distinction made by the May Court, 109 F.3d at 565, which found that a temporary denial of outdoor exercise without adverse medical effects is not a substantial deprivation while recognizing that Allen, 48 F. 3d at 1088, found a long-term deprivation substantial, regardless of effects. Thus, May supra, distinguished Allen, supra, at 1088, and Spain, supra, at 199-200, on the basis of the lengthy deprivations set forth therein, recognizing that confining an inmate to a cell "for less than 24 hours in order to

15

encourage compliance with prison security regulations does not rise to the level of deliberate indifference." Id. at 566, citing Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995).

See also, Toussaint v. Yockey, 722 F.2d 1490, 1492-93 (9th Cir. 1984) (preliminary injunction upheld requiring outdoor exercise) (cites Wright v. Rushen, 642 F.2d 1129, 1133 (9th Cir. 1981)), which compares Spain, requiring outdoor exercise where prisoners are confined to small cells twenty-four hours a day, to Clay v. Miller, 626 F.2d 345, 347 (4th Cir. 1980), which did not require outdoor exercise where inmates had dayroom access 18 hours a day; Allen v. Sakai, 48 F.3d at 1087-88 (no qualified immunity for outdoor exercise claim). Martino v. Carey, 563 F. Supp. 984, 100-1002 (D.C. Or 1983) (district court found denial of all opportunity to exercise, including even in jail cell, violated the Eighth Amendment) (denial of all outdoor exercise endangers physical and mental health of prisoners).

As a result of OP1, according to Warden Runnels, prisoners in plaintiff's classification receive, on rotating weeks, 4.5 to 5 hours of outdoor exercise and 6.75 to 7.25 hours per week respectively. This is the High Desert policy under attack. However, based on the cases above, the court cannot find that such a policy violates the Eighth Amendment in terms of lack of sufficient exercise time.

Accordingly, IT IS HEREBY RECOMMENDED that defendant's October 17, 2005 motion for summary judgment be granted and judgment be entered for defendant.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, plaintiff may file written objections with the court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Plaintiff is advised that failure to file objections

\\\\\
\\\\\
\\\\\

1  within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v.</u>
2  <u>Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).
3  DATED: 7/5/06

/s/ Gregory G. Hollows

_____
GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

6  GGH:009
   soto0571.msj